IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
April 23, 2024 Session

**RYAN MICHAEL RAMEY v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Unicoi County**
No. 7316     Lisa Rice, Judge
————————————————————

**No. E2023-00724-CCA-R3-PC**
————————————————————

The petitioner, Ryan Michael Ramey, appeals the denial of his post-conviction petition, arguing the post-conviction court erred in finding he received the effective assistance of counsel. After our review of the record, briefs, and applicable law, we affirm the denial of the petition.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

J. ROSS DYER, J., delivered the opinion of the court, in which ROBERT L. HOLLOWAY, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Cameron L. Hyder, Johnson City, Tennessee (on appeal) and Elizabeth Rae Jones, Erwin, Tennessee (at post-conviction hearing) , for the appellant, Ryan Michael Ramey.

Jonathan Skrmetti, Attorney General and Reporter; Garrett D. Ward, Senior Assistant Attorney General; Steven R. Finney, District Attorney General; and Todd Hull, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

*Facts and Procedural History*

On direct appeal, this Court summarized the facts surrounding the petitioner's convictions for rape and theft of $500 or less, as follows:

The victim, K.T.,[1] testified that on November 2, 2015, she fell asleep watching television in bed around 9:00 p.m.  K.T. testified that at some point that night, she woke up to a man standing at the foot of her bed.  K.T. recalled that the man was wearing a dark hooded sweatshirt and a baseball cap with the hood of the sweatshirt pulled up over the cap.

The man asked K.T., "Where the f--k is Earl at?"  When K.T. told the man that she did not know who Earl was, the man responded, "B---h, don't lie to me, I know you know where Earl's at."  K.T. testified that the man said that he "was just in this house a couple days ago" and that Earl owed him "money for dope."

K.T. testified that when she picked up her cell phone to call 911, the man "jumped across the bed [and] grabbed [her] by the throat."  According to K.T., she and the man then "wrestled around" until they fell off the bed.  K.T. further testified that during the attack, she "scream[ed] at the top of [her] lungs, hoping [that] the neighbors would hear [her]."

Once they were on the floor, the man pulled up K.T.'s shirt "and was rubbing on [her] chest."  K.T. testified that she begged the man to stop and not to rape her.  According to K.T., the man responded by saying, "B---h, quit looking at me," and put "a cloth" over her face.  K.T. testified that the man then "pulled down [her] underwear and started rubbing" her vagina.  She further testified that she was crying and begging the man to stop as he "stuck his fingers inside of [her]."

K.T. testified that when the man stopped touching her, he asked her if she had any money.  K.T. responded that she had some cash in her wallet.  According to her, the man took about sixty dollars out of her wallet.  The man then told her not to call the police or he would come back and kill her and her children.

K.T. testified that she lay down on floor for a while after the man left.  K.T. then went to check on her teenage son who had been sleeping in the bedroom down the hall from her bedroom.  After seeing that her son was still asleep, K.T. went to a nearby relative's house because she lost her cell phone during the struggle with the man.  K.T. told her relative to get her gun, and they went back to K.T.'s house.  K.T. woke her son up and had him go to a neighbor's house.  Her relative then called 911 and reported the incident.

---

[1] It is the policy of this Court to refer to victims of sexual crimes by their initials.

K.T. identified the [petitioner] as the man who attacked her on November 2, 2015. K.T. testified that she did not know the [petitioner] and that she had not seen him before that night. K.T. further testified that she had no doubt that the [petitioner] was the man who attacked her. K.T. explained that her television and a lamp were on during the attack and that she saw the man's face. K.T. told the jury that she would "never forget [his face] for the rest of [her] life."

K.T. testified that a few weeks after the rape, her boyfriend told her that the police had been called to a neighbor's house because "some guy had been across the street and that he had the same old story," that he was looking for Earl. K.T. recalled that she talked to her neighbor the next day and decided to go to the police station to see why "the cops let [the guy] go."

K.T. testified that when she got to the police station, she spoke to Erwin Police Department (EPD) Chief Regan Tilson. K.T. then described her interaction with Chief Tilson as follows:

> [Chief Tilson] said that . . . he was trying to figure out how to identify somebody in a lineup or pictures . . . . And he turned around and walk[ed] up to this table and pick[ed] up some pictures. [The petitioner's] picture was on top, and before [Chief Tilson] said anything, I said, "That's him."

K.T. testified that she identified the [petitioner] before Chief Tilson could even "fan [the pictures] out."

K.T. testified that she kept her doors unlocked and that her backdoor had a broken door handle. She suspected that the [petitioner] just walked into her house on November 2, 2015. K.T. further testified that her son was "a very deep sleeper" and that she was not surprised that the sounds of her being attacked by the [petitioner] and screaming did not wake him up. K.T. admitted that she had no injuries or pain caused by the attack. K.T. also admitted that it was possible she went to the police station because she heard that a suspect had been arrested.

Detective Tony Buchanan testified that he was the detective for the EPD and that he began investigating this case the morning after when he was informed about the rape. Detective Buchanan recalled that K.T. thought her attacker "was probably on foot" because she had not heard a car. So

- 3 -

Detective Buchanan decided to drive around K.T.'s neighborhood. Detective Buchanan testified that he saw the [petitioner] walking in K.T.'s neighborhood wearing a maroon hooded sweatshirt and a baseball cap. Detective Buchanan explained that he did not stop the [petitioner] because he was under the impression that the suspect was wearing a black or blue hooded sweatshirt, even though the suspect had been reported on the 911 call as wearing a brown or maroon one.

On November 16, 2015, there was a 911 call reporting that a man was "banging" on the door of the house "directly across" the street from K.T.'s house and "looking for Earl." EPD Officer Chad McKinney stopped the [petitioner] while he was walking down a neighboring street. Officer McKinney testified that the [petitioner] "seemed a little nervous" and said that "he was looking for his friend, Earl." Officer McKinney let the [petitioner] go because there were no warrants out for his arrest.

The next day, November 17, 2015, Detective Buchanan saw the [petitioner] and asked him who he had been looking for the previous night. Detective Buchanan testified that the [petitioner] said he was "looking for [his] friend, Earl." Based upon this, Detective Buchanan and Chief Tilson decided to show K.T. a photographic lineup. Detective Buchanan testified that he went to pick up K.T., but when he got to her house, he was told that she had already gone to the police station.

Chief Tilson testified that he was in the process of printing off photographs for a lineup when there was a knock on the police station door. Chief Tilson further testified that he answered the door holding a photograph of the [petitioner] without realizing that K.T. was the victim in this case until she asked to see Detective Buchanan. According to Chief Tilson, K.T. saw the [petitioner's] picture and said, "Is that him? That's him." Chief Tilson responded, "Is it?" Chief Tilson testified that K.T. responded, "Yes." Chief Tilson further testified that he thought K.T. "seemed certain" when she identified the [petitioner]. Chief Tilson did not recall telling the victim that there was a suspect in her case.

Detective Buchanan testified that, after the [petitioner's] arrest, the [petitioner] stated that he had been staying at a house a few blocks from K.T.'s home. Detective Buchanan admitted that there were no physical signs of an altercation in K.T.'s bedroom when he was there on November 3, 2015. Detective Buchanan further admitted that K.T.'s money was not found on the

- 4 -

[petitioner] when he was arrested. There were also no visible injuries on the [petitioner].

Miguel Cervantes testified that the [petitioner] "stayed" with him frequently during the autumn of 2015. Specifically, Mr. Cervantes testified that the [petitioner] slept at his house on November 2, 2015. Mr. Cervantes testified that the [petitioner] was in the house when he went to bed around 10:00 or 11:00 p.m. and that the [petitioner] was there when he woke up between 4:30 and 5:00 a.m.

Mr. Cervantes testified that it was possible that the [petitioner] left after he went to sleep, "but it would have been very hard." Mr. Cervantes explained that the [petitioner] slept in the living room and that it was "a little thin house." However, Mr. Cervantes admitted that outside of knowing that the [petitioner] was there on November 2, 2015, he was "a little shady" on the details of when or how long the [petitioner] stayed with him.

The [petitioner] denied raping K.T. The [petitioner] testified that he had never been in K.T.'s house or knocked on her door. The [petitioner] further testified that he had never met K.T. According to the [petitioner], he came to Mr. Cervantes's house from work, had a few beers, and went to bed around 10:00 or 11:00 p.m. on November 2, 2015. The [petitioner] further claimed that he only went outside to smoke that night.

The [petitioner] admitted that Mr. Cervantes's house was about two blocks from K.T.'s house. The [petitioner] claimed that on November 16, 2015, he decided to look for Earl while Mr. Cervantes was asleep. So the [petitioner] left Mr. Cervantes's house and knocked on the door of the first house he saw with its lights on. The [petitioner] explained that he had been released from jail in September 2015 and that he had met Earl while he was incarcerated. The [petitioner] claimed that he did not know Earl's address or phone number, but that he knew Earl lived in K.T.'s neighborhood. The [petitioner] further explained that he wanted to find Earl because he thought Earl might know about some possible job opportunities.

The [petitioner] testified that he was "shocked" when he was accused of raping K.T. The [petitioner] admitted that he "occasionally" used marijuana and that he had prior convictions for burglary, theft, and vandalism. The [petitioner] denied that he had ever been charged with assault or any other violent crimes.

- 5 -

Based upon the foregoing, the jury convicted the [petitioner] as charged of rape and theft of $500 or less. Following a sentencing hearing, the trial court imposed a total effective sentence of fifteen years.

*State v. Ramey*, No. E2017-00580-CCA-R3-CD, 2018 WL 1151959, at *1-3 (Tenn. Crim. App. Mar. 5, 2018), *no perm. app. filed.*

Following the denial of his direct appeal, the petitioner filed a pro se petition for post-conviction relief on February 12, 2019, arguing, in part, that trial counsel was ineffective for failing to file a motion to suppress the victim's identification of the petitioner and failing to adequately advise the petitioner regarding his right to testify. Counsel was appointed, and the petitioner filed an amended petition. An evidentiary hearing was held on April 21, 2021, during which the petitioner, Chief Regan Tilson, and Detective Tony Buchanan testified.[2]

The petitioner testified that, due to a learning disability, he often had trouble understanding the issues trial counsel discussed with him. Prior to trial, the petitioner and trial counsel spoke about the reliability of the victim's identification of him. However, the petitioner could not recall whether trial counsel discussed the possibility of filing a motion to suppress the identification. The petitioner also testified that trial counsel never spoke to him about objecting to the victim's in-court identification. On cross-examination, the petitioner agreed that trial counsel cross-examined the victim and officers about the identification during the preliminary hearing and the trial.

Regarding his decision to testify at trial, the petitioner stated that he did not realize his prior convictions would be used to impeach his testimony, and if he had known, he would have chosen not to testify. On cross-examination, the petitioner agreed that he was in criminal court several times prior to this case. He could not recall whether the trial court conducted a *Momon*[3] hearing prior to his testimony.

Chief Regan Tilson testified that approximately two weeks after the victim's assault, a patrol officer encountered the petitioner on a separate call that had similarities to the victim's case. Based on that information, Chief Tilson asked Detective Tony Buchanan to locate the victim so they could show her a photographic lineup that included the petitioner. Chief Tilson then obtained a photograph of the petitioner and was in the process of searching for similar photographs when someone knocked on the door of the police station. Chief Tilson, still holding the petitioner's photograph, answered the door and greeted the victim, whom he did not recognize. The victim saw the photograph in Chief Tilson's hand

---

[2] Although present at the evidentiary hearing, trial counsel did not testify.
[3] *Momon v. State*, 18 S.W.3d 152 (Tenn. 1999).

and stated, "That's him." Chief Tilson admitted that he would have preferred to show the victim multiple photographs at the same time, which was his general practice. Following his encounter with the victim, Chief Tilson contacted the district attorney to explain what happened. On cross-examination, Chief Tilson agreed that trial counsel "aggressive[ly]" cross-examined him at the preliminary hearing and the trial regarding the victim's identification of the petitioner.

Detective Tony Buchanan testified that he was assigned to lead the investigation concerning the rape of the victim. He agreed that there was no DNA recovered from the scene, that the victim did not suffer any injuries, and that the victim was the only witness to the crime. Although the petitioner did not have the victim's property on him when he was arrested, Detective Buchanan stated that the arrest took place several weeks after the rape and theft. Detective Buchanan agreed that there was no physical proof tying the petitioner to the crime "other than his interview." Regarding the victim's description of the perpetrator, the victim told Detective Buchanan that her assailant was wearing "a hat and a hoodie," but she could not describe his eye color or whether he had any tattoos. On cross-examination, Detective Buchanan agreed that, because the victim was digitally penetrated, he would not expect to find semen or other physical evidence at the crime scene. During the petitioner's interview, Detective Buchanan mentioned DNA, and the petitioner said, "Well, if you can get DNA" while holding up his hand with two fingers extended.

After its review of the evidence presented, the post-conviction court denied relief, and this timely appeal followed.

### *Analysis*

On appeal, the petitioner argues trial counsel was ineffective for failing to challenge the victim's identification of him from a single photograph and for failing to protect the petitioner's right to testify. The State contends the post-conviction court properly denied relief. Upon our review, we agree with the State.

The petitioner bears the burden of proving his post-conviction factual allegations by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f). The findings of fact established at a post-conviction evidentiary hearing are conclusive on appeal unless the evidence preponderates against them. *Tidwell v. State*, 922 S.W.2d 497, 500 (Tenn. 1996). This Court will not reweigh or reevaluate evidence of purely factual issues. *Henley v. State*, 960 S.W.2d 572, 578 (Tenn. 1997). However, appellate review of a trial court's application of the law to the facts is *de novo,* with no presumption of correctness. *See Ruff v. State*, 978 S.W.2d 95, 96 (Tenn. 1998). The issue of ineffective assistance of counsel presents mixed questions of fact and law. *Fields v. State*, 40 S.W.3d 450, 458 (Tenn. 2001). Thus, this Court reviews the petitioner's post-conviction allegations *de novo,* affording a

presumption of correctness only to the post-conviction court's findings of fact. *Id*.; *Burns v. State*, 6 S.W.3d 453, 461 (Tenn. 1999).

To establish a claim of ineffective assistance of counsel, the petitioner must show both that counsel's performance was deficient and that counsel's deficient performance prejudiced the outcome of the proceedings. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *State v. Taylor*, 968 S.W.2d 900, 905 (Tenn. Crim. App. 1997) (noting that the standard for determining ineffective assistance of counsel applied in federal cases is also applied in Tennessee). The *Strickland* standard is a two-prong test:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687. In order for a post-conviction petitioner to succeed, both prongs of the *Strickland* test must be satisfied. *Id*. Thus, courts are not required to even "address both components of the inquiry if the defendant makes an insufficient showing on one." *Id*.; *see also Goad v. State*, 938 S.W.2d 363, 370 (Tenn. 1996) (stating that "a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim").

A petitioner proves a deficiency by showing "counsel's acts or omissions were so serious as to fall below an objective standard of reasonableness under prevailing professional norms." *Goad*, 938 S.W.2d at 369 (citing *Strickland*, 466 U.S. at 688; *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975)). The prejudice prong of the *Strickland* test is satisfied when the petitioner shows there is a reasonable probability, or "a probability sufficient to undermine confidence in the outcome," that "but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. However, "[b]ecause of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" *Id*. at 689 (quoting *Michel v. Louisiana*, 350 U.S. 91, 101 (1955)).

## I.      Failure to File Motion to Suppress

The petitioner asserts that trial counsel provided ineffective assistance in failing to seek suppression of the victim's identification of him from a single photograph. He argues the inherent suggestive nature of the identification caused him prejudice. The State contends the post-conviction court properly found that trial counsel was not ineffective for failing to file a motion to suppress.

In order to establish a successful claim of ineffective assistance of counsel based on counsel's failure to file a motion to suppress evidence, a petitioner "must prove: (1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Phillips v. State*, 647 S.W.3d 389, 404 (Tenn. 2022). The petitioner continues to bear the burden of proving the factual allegations supporting his or her claims by clear and convincing evidence. *Id.* (citing Tenn. Code Ann. § 40-30-110(f)). In order to prevail, the petitioner should "[i]n essence . . . incorporate a motion to suppress within the proof presented at the post-conviction hearing." *Cecil v. State*, No. M2009-00671-CCA-R3-PC, 2011 WL 4012436, at *8 (Tenn. Crim. App. Sept. 12, 2011).

In *Neil v. Biggers*, 409 U.S. 188 (1972), the United States Supreme Court set forth the test for determining whether the pretrial identification of a defendant is admissible as evidence at trial. First, this two-part analysis requires the trial court to determine whether the identification procedure was unduly suggestive. *Biggers*, 409 U.S. at 198. The identification cannot be "conducted in such an impermissibly suggestive manner to create a substantial likelihood of irreparable misidentification." *State v. Cribbs*, 967 S.W.2d 773, 794 (Tenn. 1998). This Court has stated that a single photographic lineup is inherently suggestive. *See State v. Hill*, No. E2020-00721-CCA-R3-CD, 2021 WL 1742291, at *7 (Tenn. Crim. App. May 3, 2021); *State v. Tate*, No. E2012-02576-CCA-R3-CD, 2013 WL 5436533, at *5 (Tenn. Crim. App. Sept. 27, 2013).

If the court finds the identification procedure was unduly suggestive, then the second question is whether the identification was reliable despite this undue suggestion. *Biggers*, 409 U.S. at 198-99. The factors to be considered in evaluating the reliability of an identification include: (1) the opportunity of the witness to view the criminal at the time of the crime, (2) the witness' degree of attention, (3) the accuracy of the witness' prior description of the criminal, (4) the level of certainty demonstrated by the witness at the confrontation, and (5) the length of time between the crime and the confrontation. *Id.* at 199-200.

At the evidentiary hearing, the petitioner testified that he spoke with trial counsel regarding the reliability of the victim's identification of him. However, the petitioner could not recall whether they discussed filing a motion to suppress and testified that they did not

discuss the possibility of objecting to the victim's in-court identification of the petitioner. On cross-examination, the petitioner agreed that trial counsel cross-examined the victim and officers about the identification during the preliminary hearing and the trial. Chief Tilson testified that he was assembling a photographic lineup that included the petitioner's photograph when the victim knocked on the door of the police station. Chief Tilson did not recognize the victim and answered the door holding the petitioner's photograph. When the victim saw the photograph, she stated, "That's him." Chief Tilson agreed that showing the victim a single photograph was not standard procedure and testified that he would have preferred to show multiple photographs at the same time.

We note that the petitioner's argument relative to the reliability of the victim's identification was raised on direct appeal, and this Court concluded that the victim's testimony that she would "never forget" her attacker's face coupled with the circumstances of her identification were sufficient to sustain the petitioner's convictions. Furthermore, in finding the petitioner was not entitled to plain error relief on the trial court's admission of the victim's single photograph and in-court identifications, this Court concluded that

> defense counsel cross-examined K.T. and Chief Tilson extensively about K.T.'s identification of the [petitioner] at the police station in an attempt to attack K.T.'s credibility. Likewise, defense counsel argued in both his opening and closing statements that the exchange between Chief Tilson and K.T. made any identification of the [petitioner] suspect. All of this is consistent with a tactical decision to waive the issue in order to attack K.T.'s credibility.

Even assuming arguendo that the single photograph identification was suggestive, the *Biggers* factors establish that the victim's identification was reliable. When the victim awoke to find the petitioner in her bedroom, the television was on as well as a bedside lamp. Although, the petitioner was initially standing at the foot of the victim's bed, when he "jumped on top of [her]" the petitioner's face was very close to the victim's, and she stared at the petitioner until he covered her face with a cloth. The circumstances were such that the victim would have paid close attention to the petitioner. The victim described the petitioner consistently and provided police with his approximate height, build, and clothing. Two weeks after the assault, Chief Tilson was in the process of preparing a photographic lineup when the victim knocked on the door to the police station. Chief Tilson, unaware of what the victim looked like, opened the door holding the petitioner's photograph, and the victim stated, "Is that him? That's him." Chief Tilson asked, "Is it?", and the victim replied, "Yes." Chief Tilson testified that the victim "seemed certain" about the identification. Moreover, this Court previously reviewed the petitioner's challenge of the victim's identification and found that trial counsel made a tactical decision not to file a motion to suppress in order to challenge the victim's credibility. The fact that a strategy

or tactic failed or was detrimental to the defense does not, alone, support a claim for ineffective assistance of counsel. *Cooper v. State*, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992). Deference is given to sound tactical decisions made after adequate preparation for the case. *Id.* Accordingly, trial counsel was not deficient for failing to challenge the identification, and the petitioner is not entitled to relief on this issue.

## II. Failure to Protect the Petitioner's Right to Testify

The petitioner argues trial counsel was ineffective for failing to protect the petitioner's right to testify. The petitioner alleges trial counsel failed to inform the petitioner that he would be subject to impeachment with his prior convictions if he chose to testify at trial. The State contends the post-conviction court properly found that trial counsel was not ineffective in failing to protect the petitioner's right to testify.

At the evidentiary hearing, the petitioner testified that he did not know that his prior convictions would be used to impeach his testimony if he testified at trial, and had he known, he would not have testified. On cross-examination, the petitioner could not recall whether the trial court conducted a *Momon* hearing prior to his testimony.

In ruling on this issue, the post-conviction court specifically discredited the petitioner's testimony that he was unaware that his prior convictions would be used to impeach him. "Questions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact," and the post-conviction court's credibility determinations are conclusive on appeal unless the evidence preponderates against them. *State v. Odom*, 928 S.W.2d 18, 23 (Tenn. 1996). Although the petitioner claimed he was unaware that his prior convictions would be admissible should he testify, the record shows that it was trial counsel who initially brought up the petitioner's convictions, asking the petitioner if he had "been in trouble with the law before." After the petitioner agreed that he had prior dealings with law enforcement, trial counsel asked the petitioner to "tell [the jury] a little bit about [his] past charges," and the petitioner listed his prior convictions and testified that he was released from jail a few months before the victim's assault. As the post-conviction court noted in its order denying relief, "[t]his exchange between [the petitioner] and trial counsel indicates [] that [the petitioner] and trial counsel had discussed how the issue of prior crimes of dishonesty should be dealt with during his trial testimony and that he would be asked about those in the presence of the jury." Therefore, the evidence does not preponderate against the post-conviction court's credibility determination, and the petitioner is not entitled to relief on this issue.

### *Conclusion*

Based upon the foregoing authorities and reasoning, we affirm the post-conviction court's judgment denying the petitioner post-conviction relief.

_____
J. ROSS DYER, JUDGE